In the

# United States Court of Appeals
## For the Seventh Circuit

No. 25-1045

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

GIULIO PALMA,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:20-cr-00707-1 — **Robert W. Gettleman**, *Judge.*

ARGUED DECEMBER 8, 2025 — DECIDED JULY 20, 2026

Before ROVNER, JACKSON-AKIWUMI, and MALDONADO, *Circuit Judges.*

MALDONADO, *Circuit Judge.* In 2015, Giulio Palma hatched a plan with his friend: They would find investors to pool funds for purchasing and developing luxury Italian properties to resell or turn into short-term rentals. Palma indicated that he had special connections in Italy, through which he could obtain high-end properties at discounts. Over the next several years, Palma and his friend raised $6 million for the

venture, but Palma never acquired any properties for the investors. And despite repeated representations that he would be paid only after acquiring properties, Palma took around $2 million of the funds for personal use, without the investors' knowledge. These transactions were discovered in 2019, and in 2023, a jury found Palma guilty on six counts of wire fraud. The district court denied his post-trial motion for judgment of acquittal and sentenced him to 36 months in prison. Palma now appeals, arguing that there was insufficient evidence to convict. We affirm—the evidence presented at trial amply supported the jury's decision.

## I. Background

### A. The Scheme

In 2015, Palma approached his friend and former business partner, Graham Kos, with an idea to purchase and develop real estate in Italy, the goal being to sell the properties for a profit or turn them into vacation rentals. Palma touted his special connections in Italy, through which he would have access to high-end properties off the market and at a discount. Kos thought this sounded like "a potentially very lucrative opportunity." He and Palma discussed an arrangement under which Palma would receive a commission of 7.5% of the purchase price for any properties acquired.

The two got to work securing funds for their venture. Kos made some initial investments of his own and began searching for other investors. Over the next four years, Kos and Palma raised about $6 million in funding, around $1.7 million of which Kos contributed along with his wife. Besides the Koses, there were four other investment sources, who pro-

vided the money with the understanding that it would be used to develop and purchase Italian properties:

*Willem Robberts*. Kos approached Robberts, a family friend, in 2015 about becoming an investor. Robberts thought it sounded like a "sensible business case," especially with the "unique situation of having [] access to properties that are typically not available to the . . . public" via Palma. So, Robberts and Kos created a company called Ko-Ro Investments, Inc., with Kos serving as the CEO and Robberts serving as the CFO. Robberts (along with his wife) made an initial investment of $412,500 and invested another $37,000 later. These (and all other) investments were deposited into a checking account that was opened by Palma in July 2015 in the name of Ko-Ro Investments.

Later in 2015, Palma, Kos, and Robberts traveled to Italy to look at three properties in Florence. Kos and Robberts decided to move forward on all three properties, and they believed that Palma was initiating the purchases. Over the next 18 months, Robberts repeatedly requested financial information, documentation, purchase agreements, and the like but received nothing. Then, in a call in May 2017, Palma told Kos and Robberts that no properties were under contract and that an additional $400,000 was needed. Palma also claimed that he had been contributing his own money to the venture and was now experiencing financial hardship. Robberts expressed his discomfort with the situation, and he took a more passive role in the business at this point, mainly concerned about how he could salvage his investment.

*Michael Shipp*. Kos approached Shipp, a longtime friend and business partner, in late 2015. Shipp (along with his wife) contributed $125,000 to invest in a particular property.

Shortly thereafter, Shipp learned from Kos that the purchase had fallen through and that his investment would be transferred to Continuum Partners (a separate entity that was created to act as a holding company for Ko-Ro). At various points, Shipp had calls with Kos and Palma, during which Palma communicated that more funds were needed to secure properties. So, over the next several years, Shipp made additional investments with Continuum, bringing his total contributions to more than $700,000. It was "pretty important" to Shipp that there was no upfront compensation for Kos or Palma because things were "taking longer," they were "having lots of problems," and he was concerned about the money "going where it should be going."

*Karen and Andrew Boone.* Karen Boone worked with Kos's wife. She and her husband, Andrew, invested $425,000 in May 2016, to join in on the purchase of a property with the Koses and Shipp as a rental and vacation home. After making this initial investment, the Boones (like Shipp) learned from Kos that there was a problem securing the property. Kos then "pitched" for them to roll their investment into Continuum and the properties that Kos and Robberts had been pursuing. The Boones agreed to the rollover.

A few months later, Kos emailed an operating agreement to the Boones, which prompted questions about what compensation Kos and Palma might be receiving. Kos responded to the Boones (with Palma copied) that to date—November 2016—neither of them had received compensation from the company and that Palma's compensation was based on the acquisition of property. A few days later, Kos updated the operating agreement for the Boones, memorializing the communicated compensation structure.

The Boones continued to receive assurances that Palma and Kos were not being compensated, but it was also clear that the men were "struggling to get everything off the ground" because they were asking for additional investments and no properties had been acquired. In 2018, the Boones made two additional investments totaling $225,000. The Boones then asked some "pointed questions" about the business during a call with Palma and Kos. Palma "lashed out" and complained about spending all his time pursuing the properties and never getting paid. The Boones became "increasingly concerned that [they] were not going to ever see [their] money back."

*James Hallberg*. Hallberg, who owned a holding company and had some familiarity with Kos, joined the venture in 2018, after some initial solicitations by Kos. He made three investments in 2018, totaling $1,418,000, and invested $1,080,000 more in January 2019. Some of these investments were personal and some were through his holding company. Prior to the 2019 contribution, Hallberg met with Palma and Kos in his office in Bedford Park, Illinois. During this meeting, Hallberg agreed to make the second investment but wanted assurances that the money would be used only for the purchase, transfer tax, and construction of specific properties. The three also discussed that Palma and Kos would be contributing only their time and services ("sweat equity"), rather than monetary investments. To make sure that Palma and Kos would not be taking funds from his investment, Hallberg asked how they were going to support themselves during the acquisition and development process. Palma and Kos assured him that they had income through their other successful businesses.

After the meeting, Hallberg's attorney drafted an operating agreement between Hallberg's holding company and Continuum to govern the $1,080,000 investment. The agreement identified two properties, the total amount to be spent on each property, and how the money was to be spent (a certain amount for purchase, a certain amount for transfer tax, and a certain amount for construction). The agreement also specified that the holding company and Continuum would each own half of the shares; that Hallberg's company would receive all distributions until it received a return on its capital; and that Palma and Kos would not be compensated for their services (though "reasonable costs and expenses incurred" would be covered). Hallberg's attorney periodically reached out to Palma on behalf of Hallberg to ask for updates about the properties, but Palma gave only vague assurances and did not provide information about where the money had gone or how it was being spent. In May 2019, Palma emailed the attorney, complaining about the fact that he had never been paid for his services.

## B. The Bank Account

Things came to a head in 2019, when, for the first time, the investors received information about the funds in the Ko-Ro bank account. Back in 2015, Palma had hired an accountant, Michael Phillips, to help with setting up Ko-Ro Investments and with bookkeeping. Investments that came through Continuum were also funneled to the Ko-Ro account. Palma and Phillips were the only ones with access to the account until mid-2019. At that time, Kos contacted Phillips with questions

about the use of Ko-Ro funds and obtained access to the account.

The financial records showed that Palma had taken around $2 million from the account. Specifically, Palma transferred more than $875,000 directly to his personal accounts and made multiple cash withdrawals (with each transaction ranging from $20,000 to $60,000) that he immediately deposited into his personal accounts. He also used (via checks, electronic transfer, or debit card) $178,775 in corporate funds for personal purchases such as jewelry, flights, hotels, restaurants, groceries, liquor, health insurance, his credit card debt, his mortgage, and title company expenses for his personal property purchases. Similarly, Palma spent $483,000 on personal expenses (on retail purchases, Illinois property taxes, and medical, fitness, and tuition expenses) using the company's credit card, which he paid off with company funds. Many of these expenditures were, based on information Palma provided to Phillips, falsely characterized as business expenses on the company's books.

## C. District Court Proceedings

In October 2020, Palma was indicted on seven counts of wire fraud under 18 U.S.C. § 1343. His case proceeded to trial in late 2023, at which investors testified about their experiences with Palma and Ko-Ro/Continuum. The investors also testified that (1) they believed Palma would not be compensated until some time after acquiring the properties; (2) they would not have invested in the business had they known Palma was using their money for personal expenses; and (3) they invested intending to make money.

The jury returned a guilty verdict on six of the counts. Palma moved for judgment of acquittal and for a new trial, and the district court denied both motions. In its denial of the motion for judgment of acquittal, the district court concluded that the evidence was "more than enough" to support the jury's verdict. The evidence, the court reasoned, clearly established Palma's control over the account from which the money was misappropriated and showed that he took millions of the funds for his own use. Moreover, Palma never disclosed the use of the funds and repeatedly misled investors by complaining that he was working without pay. In January 2025, the district court sentenced Palma to 36 months in prison, followed by two years of supervised release.

## II. Discussion

Palma appeals, challenging the denial of his motion for judgment of acquittal. We review that denial de novo, but "practically speaking . . . the standard of review is that for sufficiency of the evidence." *United States v. Maxwell*, 143 F.4th 844, 857 (7th Cir. 2025) (quoting *United States v. Peterson*, 823 F.3d 1113, 1120 (7th Cir. 2016)). "In evaluating the sufficiency of the evidence, we view the evidence in the light most favorable to the government." *Id.* (quoting *United States v. Garcia*, 919 F.3d 489, 496 (7th Cir. 2019)). This is a "nearly insurmountable hurdle," and we reverse "only where no rational trier of fact could have found the defendant guilty." *Id.* (quoting *United States v. Johnson*, 874 F.3d 990, 998 (7th Cir. 2017)).

To establish a wire fraud violation under 18 U.S.C. § 1343, the government needed to prove that Palma "(1) participated in a scheme to defraud; (2) intended to defraud; and (3) caused an interstate wire to be used in furtherance of the scheme." *United States v. Gustafson*, 130 F.4th 608, 614 (7th Cir.

2025) (citing *United States v. White*, 737 F.3d 1121, 1129 (7th Cir. 2013)). Palma's arguments implicate only the first two elements.

## A. Scheme to Defraud

"A scheme to defraud requires 'the making of a false statement or material misrepresentation, or the concealment of [a] material fact.'" *United States v. Sheneman*, 682 F.3d 623, 628–29 (7th Cir. 2012) (quoting *United States v. Powell*, 576 F.3d 482, 490 (7th Cir. 2009)). And "a false statement is material if it has a natural tendency to influence, or is capable of influencing, the decision of the persons or decision-making body to whom it was addressed." *United States v. Filer*, 56 F.4th 421, 431 (7th Cir. 2022).

Palma insists that there was insufficient evidence to establish a scheme to defraud because he had nothing to do with the solicitation of the investors (he points the finger at Kos), the investors knew he was being paid, and the investors received tax benefits from the losses they sustained. He also likens his case to *United States v. Weimert*, 819 F.3d 351 (7th Cir. 2016), in which we found insufficient evidence for a wire fraud conviction where, during a business negotiation, the defendant made immaterial deceptive statements about the parties' negotiating positions but otherwise disclosed all material terms of the deal.

*Weimert* does not help Palma. We have warned litigants against "read[ing] too much into *Weimert*'s narrow holding." *Filer*, 56 F.4th at 430. And, unlike the defendant in *Weimert*, Palma kept investors in the dark about a key fact: He was using their money for personal purposes and not for property

transactions as they assumed. *See Weimert*, 819 F.3d at 358, 366–67.

In fact, there was plenty of evidence showing Palma making (or causing Kos to make) misrepresentations and omissions about the fact that he was taking money from the Ko-Ro account. That Palma was not involved in soliciting some investors (he does not contest that he met with Hallberg before his second investment) is immaterial; he was party to numerous email exchanges with the investors, in which (uncorrected) representations were made that he was not getting paid. He also complained in multiple calls with the investors that he was working for free. Further still, Palma caused Phillips to falsely characterize many of his expenditures and withdrawals as business expenses (or to leave them unlabeled), further concealing his misuse of the funds.

And it was reasonable for a jury to infer that Palma's concealment of his misuse of funds influenced the investors. For example, Hallberg made his second investment only after executing an operating agreement that dictated the money would not be used to pay Palma; the Boones contributed additional funds after confirming that Palma was not getting paid; and Shipp testified that the fact Palma was not getting paid upfront was important to his continued participation in the venture. The investors also testified that they would not have provided the money if they had known Palma was going to use the funds as he did.

Likewise, Palma's assertion that the investors knew he was getting paid is belied by their testimony. All testified that they believed Palma would be paid after the properties were acquired. And his assertion that the investors benefited from this scheme by way of tax deductions is inapposite—the in-

vestors testified that they wanted, and were expecting, returns on their investments. The jury reasonably accepted the investors' understanding of the events and rejected Palma's alternative theories. *See United States v. Godinez*, 7 F.4th 628, 638–39 (7th Cir. 2021) ("[W]e respect 'the exclusive function of the jury to determine the credibility of witnesses[.]'") (quoting *United States v. Reed*, 875 F.2d 107, 111 (7th Cir. 1989)).

Finally, to the extent Palma faults the investors for failure to perform due diligence before making risky investments, "it is no defense that the intended victim . . . was too trusting and gullible." *Weimert*, 819 F.3d at 355 (citing *United States v. Coffman*, 94 F.3d 330, 333 (7th Cir. 1996)).

## B. Intent to Defraud

Intent to defraud requires "a wil[l]ful act by the defendant with the specific intent to deceive or cheat, usually for the purpose of getting financial gain for one's self or causing financial loss to another." *United States v. White*, 737 F.3d 1121, 1128 (7th Cir. 2013) (quoting *United States v. Britton*, 289 F.3d 976, 981 (7th Cir. 2002)). Intent can be established "by circumstantial evidence and by inferences drawn from examining the scheme itself that demonstrate that the scheme was reasonably calculated to deceive." *Id.* (quoting *Britton*, 289 F.3d at 981).

Palma contends that there was insufficient evidence that he acted with intent to defraud because he was acting in good faith, consistent with his "entitlement" to a 7.5% commission. But there is nothing in the record suggesting that Palma and Kos had agreed to an arrangement in which Palma could take 7.5% of whatever happened to be in the company account whenever he wanted. Nor would that theory justify the

amounts Palma actually took—nearly a third of the investments. And to the extent Palma suggested at oral argument that he was entitled to take 7.5% of the $20 to $30 million Kos hoped to *eventually* raise for the venture, the record likewise does not support that theory. The evidence was clear—certainly clear enough for a jury to reject Palma's argument— that the 7.5% commission was contingent on and to be paid after the acquisition of property. And, of course, no properties were ever acquired.

Palma's pattern of misleading the investors about his finances and causing Phillips to mischaracterize his expenditures as business-related further undermines his argument that he was acting in good faith. A jury could reasonably infer from these actions that he understood he was not "entitled" to that money.

### III. Conclusion

Seeing no basis to disturb the jury's verdict, we AFFIRM the judgment of the district court.